554 F.2d 586
 95 L.R.R.M. (BNA) 2178, 51 A.L.R.Fed. 599,
81 Lab.Cas. P 13,182
 Peter J. BRENNAN, Secretary of Labor, United States Dept. of
Labor, Edward Sadlowski, Intervenor Plaintiff,
Anthony Tomko, Intervenor Plaintiff,
v.
UNITED STEELWORKERS OF AMERICA AFL-CIO-CLC (DISTRICT 15)
(DISTRICT 31).
Appeal of Edward SADLOWSKI, Intervenor above named, et al.
 No. 76-1169.
 United States Court of Appeals,
Third Circuit.
 Argued Nov. 19, 1976.
Decided April 20, 1977.
 
 John W. Douglas and C. Michael Buxton, Covington & Burling, Washington, D. C., for appellant-intervenor plaintiff Sadlowski.
 Kenneth J. Yablonski, Washington, Pa., for appellants.
 Robert M. Weinberg and Michael H. Gottesman, Bredhoff, Cushman, Gottesman & Cohen, Washington, D. C., James D. English, Pittsburgh, Pa., for appellee.
 Edwin E. Huddleson, III, Civil Div., U. S. Dept. of Justice, Washington, D. C., for Secretary of Labor, U. S. Department of Labor.
 Before VAN DUSEN and ALDISERT, Circuit Judges, and BROTMAN, District Judge.*
 OPINION OF THE COURT
 VAN DUSEN, Circuit Judge.
 
 
 1
 This is an appeal from a district court order, arising out of an action brought by the Secretary of Labor (Secretary) under Title IV of the Labor-Management Reporting and Disclosure Act of 1959 (LMRDA), 29 U.S.C. § 481 et seq.,** to set aside an election for district director of District 31 of the United Steelworkers of America (USWA or Union). In this election, Edward Sadlowski, the intervenor-plaintiff, was narrowly defeated allegedly due to voting irregularities which violated the LMRDA. After settlement was reached, a new election was held, which Sadlowski won by a substantial margin. The present appeal concerns the district court denial of intervenor-plaintiff's application for attorneys' fees and expenses incurred in the process of protesting and assisting the Secretary in attacking LMRDA violations.
 
 
 2
 This appeal presents important problems in the administration of Title IV of the LMRDA. The district court held that a defeated candidate for union office who intervenes in an action brought by the Secretary of Labor to avoid an election is precluded by the statute from recovering an award of attorneys' fees against the union, and that even if there is no statutory preclusion such an intervenor may not recover attorneys' fees under the "common benefit" doctrine for his actions in complaining to the Secretary, participating in litigation, shaping a settlement, and helping to police a rerun election.[1] The Secretary takes no position on the district court denial of attorneys' fees.
 
 
 3
 Disagreeing with the district court as to both statutory preclusion and "common benefit," we will reverse this district court order and remand for further consideration of this record in the light of the applicable legal principles and for further proceedings consistent with this opinion.
 
 I. HISTORY OF THE CASE
 
 4
 As noted below at pages 591, 601, and 604, this appeal is before the court on a motion to dismiss in which defendant requests that the application for attorneys' fees "be dismissed on its face" (see page 604 below), without regard to the actual truth of (1) the allegations in the application, and (2) the statements in the other record documents, such as depositions. We emphasize that we are not passing on the truth of the statements in the record or on the character of the intervening plaintiffs, as opposed to that of the high-ranking officers of the union, but we are required, under the posture of the case as it existed at the time of the district court order from which the appeal was taken, to take all well-pleaded allegations in the record as true for purposes of this appeal and to construe them in the light most favorable to the plaintiffs (see page 604). These record facts are important in the determination of whether the district court was justified in rejecting the application for attorneys' fees as a matter of law, rather than making its decision as a matter of discretion in the light of the record facts before it.
 
 
 5
 On February 13, 1973, the USWA held an election for the position of district director of its District 31. That unit, with approximately 300 locals and 130,000 members in Illinois and Indiana, is the largest district in the Union. This election for district director was the first to be contested in nearly twenty-five years.
 
 
 6
 The candidates were Edward Sadlowski and Samuel Evett, the personally chosen successor to the district's long-time director, who was retiring after thirty years in office. Evett, in the words of then USWA President I. W. Abel, was the candidate of the Union's "official family."[2] Abel explained that the "official family" was composed of incumbent district directors and the officers of the International Union. The benefits of "official family" membership included automatic support financial and otherwise in their election efforts.[3]
 
 
 7
 Early election returns gave Sadlowski a lead, but a complete tabulation took nearly three days. During that period Sadlowski received reports of widespread violations of LMRDA, such as ballot fraud, illegal electioneering, deprivation of secret ballot, and interference with observers. The final tabulations published by the USWA International Tellers were: Evett 23,394, and Sadlowski 21,606. In view of the reports of massive irregularities, Sadlowski immediately sought legal assistance to aid him in protesting the election in accordance with the requirements of the USWA constitution.[4] Such a challenge was mandated by the LMRDA requirement that internal union remedies be exhausted as a prerequisite to filing a complaint about an election with the Secretary of Labor.
 
 
 8
 Sadlowski's protest was submitted to the USWA International Tellers on February 23, 1973, and a hearing was held on March 23, 1973. In late April 1973 the Tellers issued a report upholding the election of Evett. By letter dated May 1, 1973, Sadlowski appealed that decision to the USWA International Executive Board, again in accordance with the Union constitution. On May 31, 1973, with President I. W. Abel presiding, the Board considered Sadlowski's complaint. On that same day the report of the Tellers was sustained.
 
 
 9
 Sadlowski then filed a timely complaint with the Secretary, pursuant to Title IV of the LMRDA, 29 U.S.C. § 482(a). The Department of Labor completed its Report of Investigation in August 1973, and on November 8, 1973, the Secretary instituted suit in the Western District of Pennsylvania seeking to void the District 31 election. Sadlowski's motion to intervene as a plaintiff was granted by the district court in January 1974.
 
 
 10
 After extensive pretrial proceedings, in which Sadlowski's counsel played an active role, the district court approved a settlement agreement, on August 23, 1974. It directed that a new election for district director be held on November 19, 1974. In this new election, Sadlowski was elected director of District 31 with 39,637 votes to 20,158 for Evett. An order and decree, based upon the Secretary's certification of the election results, was entered on December 2, 1974.
 
 
 11
 On January 31, 1975, counsel for Sadlowski submitted a Verified Application for Attorneys' Fees and a supporting memorandum. The district court referred the application to a magistrate. After briefing and argument, the magistrate recommended that the request be denied. Sadlowski filed exceptions to the magistrate's recommendation, and after a hearing the district judge overruled the exceptions and adopted the Magistrate's Report and Recommendation, making the sweeping legal conclusion set forth in note 1 above. This appeal followed.
 
 II. ISSUE OF STATUTORY PRECLUSION
 
 12
 The threshold question in this case is whether an award of attorney's fees to an intervenor-plaintiff such as Sadlowski is precluded by Title IV of the LMRDA.[5]
 
 
 13
 The Union advances two reasons for finding preclusion, both of which fall under the rubric of the nature and comprehensiveness of the remedial scheme: (1) the absence of specific authorization to award attorney's fees under Title IV, and (2) the fact that the primary enforcement responsibility for Title IV rests with the Secretary of Labor rather than with private litigants. We disagree, because we have concluded that the district court had the right, in its discretion, to award attorneys' fees on the record in this case. We hold that the district court did not have the power to reject the claim for attorneys' fees on the basis of the legal conclusions stated in note 1 above, which we reject.
 
 
 14
 A. Absence of Specific Authorization for an Award
 
 
 15
 The Union urges that an award of attorney's fees under Title IV of the LMRDA is precluded by the absence of any specific provision for such an award in Title IV, in view of specific provision for either attorney's fees or appropriate relief in Titles I, II, III and V.[6] It buttresses this contention by noting that Congress rejected a bill, H.R. 8342, 86th Cong., 1st Sess. § 402(a) (1959), which provided for union member suits under Title IV, and authorized the award of appropriate relief, including attorney's fees.
 
 
 16
 USWA primarily relies upon Fleischmann Distilling Corp. v. Maier Brewing Co., 386 U.S. 714, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967) for the proposition that an explicit, comprehensive, and exclusive remedial scheme may bar the recovery of attorney's fees. In Fleischmann, the Supreme Court held that, because the remedial provision of the Lanham Act specifically "provided not only for injunctive relief, but also for compensatory recovery measured by the profits that accrued to the defendant by virtue of his infringement, the costs of the action, and damages which may be trebled in appropriate circumstances," (386 U.S. at 719, 87 S.Ct. at 1408), such precise specification of remedies, encompassing authority which could as a practical matter be used to relieve the burden of counsel fees, presented a strong case against further judicial relief. Although we agree that a truly comprehensive remedial scheme may bar such an award in certain circumstances, we believe that the analytical method embraced by Fleischmann was substantially undercut by later Supreme Court decisions, thus casting considerable doubt upon the interpretation urged by the USWA.[7]
 
 
 17
 In Fleischmann, the Court was willing to find preclusion in Congress' selective provision of attorney's fees in other statutes and unsuccessful efforts to enact a similar measure into the Lanham Act. But in Mills v. Electric Auto-Lite Co., 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970) and Hall v. Cole, 412 U.S. 1, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973), the Supreme Court enunciated a presumption against preclusion and sanctioned "common benefit" awards in the context of statutory causes of action despite the provision for attorney's fees in other sections of the same statute. Mills, 396 U.S. at 390-91, 90 S.Ct. 616; Hall, 412 U.S. at 10-11, 93 S.Ct. 1943.
 
 
 18
 In Hall, the Supreme Court held that a plaintiff in a suit instituted under Title I of the LMRDA could recover attorney's fees even though Title I does not specifically authorize such an award. It stated that unless remedies are " 'meticulously detailed,' " to " 'mark the boundaries of power to award monetary relief,' " 412 U.S. at 9, 93 S.Ct. at 1948, or the legislative history presents an unmistakably " 'definite and absolute setting of the Congressional face against the giving of such incidental relief by the courts where compatible with established equitable principles,' " id. at 12, 93 S.Ct. at 1950, it will not be inferred that Congress desired to deny to the courts the traditional power to grant equitable relief in the form of counsel fees in appropriate cases.
 
 
 19
 At oral argument the Union's counsel contended that the rejection by Congress of a version of Title IV that provided for direct private enforcement and attorney's fees was conclusive evidence of an intent to limit the courts' exercise of their equitable powers in suits under Title IV. Such intent cannot, in our view, be drawn from the legislative record. As the Supreme Court's review of this legislative history in Trbovich v. United Mine Workers, 404 U.S. 528, 532-36, 92 S.Ct. 630, 30 L.Ed.2d 686 (1972) makes clear, congressional debate centered upon the relative merits of enforcement actions by union members and by the Secretary of Labor not upon the propriety or the possibility of equitable awards. Local 639 pointed out:
 
 
 20
 "The Conference Committee and the House ultimately adopted the public enforcement scheme of the Kennedy-Ervin bill, S. 1555, presumably because they agreed with the Senate that the Secretary should screen frivolous complaints and consolidate meritorious ones.[51] This legislative history, as Trbovich holds, 'can in no sense be read as a rejection of all forms of private participation in enforcement litigation,' because Congress never focused on 'the possibility that union members might assist the Secretary rather than displace him.' Id. at 536, 92 S.Ct. 630. Similarly, while Congress adopted a particular mode of enforcement, it failed to address with any detail the scope of relief, or what the court's role would be at the remedial stage. (One footnote omitted.)"
 
 
 21
 51. The Conference Report simply states that the Senate bill's administrative enforcement scheme prevailed over the House bill's private suit provision, without tendering any explanation for the outcome. H.R.Rep.No.1147, 86th Cong., 1st Sess. 35 (1959).
 
 
 22
 543 F.2d at 387. In no sense can this legislative history be said to offer the affirmative guidance the Union asserts that it does. As Professor Archibald Cox, a principal consultant to the draftsmen of the LMRDA, has suggested:
 
 
 23
 "because much of the bill was written on the floor of the Senate or House of Representatives and because so many sections contain calculated ambiguities or political compromises . . ., the courts would be well advised to seek out the underlying rationale without placing great emphasis on close construction of the words."
 
 
 24
 Internal Affairs of Labor Unions Under the Labor Reform Act of 1959, 58 Mich.L.Rev. 819, 852 (1960). To hold that the undiscussed, unexplained adoption of an alternative enforcement scheme satisfies the "definite and absolute" standard promulgated by Hall would, in this case, be incorrect.
 
 
 25
 Nor do we believe that the remedial scheme created by Title IV approaches the meticulous detail of the provision involved in Fleischmann or the detail necessary for a finding of preclusion of equitable powers and remedies. Since its enactment, the LMRDA, and Title IV, enforcement scheme has been filled out by the court with many details. In Hall v. Cole, which dealt with preclusion of the exercise of equitable powers and the award of attorney's fees under Title I of the LMRDA, the petitioners argued that Congress intended to preclude any such award under Title I since it only provided for "such relief (including injunctions) as may be appropriate," while §§ 201(c) (29 U.S.C. § 431(c)) and 501(b) (29 U.S.C. § 501(b)), expressly provided for attorney's fees. In response, the Supreme Court stated that:
 
 
 26
 "Confronted with a virtually identical situation in Mills, we explained that the inclusion in certain sections of the Securities Exchange Act of 1934 of express provisions for recovery of attorney's fees 'should not be read as denying to the courts the power to award counsel fees in suits under other sections of the Act when circumstances make such an award appropriate . . . .' 396 U.S., at 390-91, 90 S.Ct. (616), at 625."
 
 
 27
 412 U.S. at 11, 93 S.Ct. at 1949.
 
 
 28
 Title IV itself has been the subject of considerable judicial elaboration and expansion. In Trbovich, supra, the Supreme Court held that union member intervention in suits brought by the Secretary for violation of Title IV was not precluded by the fact that actions by the Secretary are the exclusive post-election remedy provided for by the statute. Trbovich was extended in Dunlop v. Bachowski, 421 U.S. 560, 95 S.Ct. 1851, 44 L.Ed.2d 377 (1975), which held that union members are entitled to a statement of supporting reasons where the Secretary decides not to pursue the union member's complaint.
 
 
 29
 The fact that the Supreme Court has found it necessary to supplement the structure of Title IV on two occasions suggests that the guidelines of Hall (see page 592 above) have been met by the facts of this case. Also, Trbovich and Bachowski go much further toward supporting the view that:
 
 
 30
 "notwithstanding the absence of a broad relief provision in section 402, the court in a Title IV action faces the same task as if it were adjudicating a union member suit under the other titles to grant relief according to the necessities of the case, i.e., to fashion 'appropriate' relief."
 
 
 31
 Local 639, 543 F.2d at 388. The question is not whether a union member is entitled to recover attorney's fees under the statute alone, where the role prescribed for him is complaint to the Secretary after exhaustion of internal union procedures. The question is what relief a union member is entitled to after having intervened in and participated in the prosecution of an action brought by the Secretary under Title IV in the manner anticipated by the Supreme Court in Trbovich.
 
 
 32
 B. Intervenor's Role in Administrative Enforcement
 
 
 33
 At the outset of this inquiry, it is clear that the Secretary has the exclusive power to bring post-election challenge suits, and that aggrieved candidates are permitted to intervene solely to support the Secretary's complaint and may not add substantive claims. See Trbovich, 404 U.S. at 530-37, 92 S.Ct. 630. However, correct as those observations are, they overlook the role of union members and intervenors in prosecution of Title IV violations, and the relationship between union members, intervenors, and the Department of Labor under both the statute and the relevant Supreme Court decisions.
 
 
 34
 Even absent the gloss of case law, it is apparent that the Congress intended to rely heavily upon the vigorous efforts of union members in prosecuting Title IV violations. The statutory framework embodies a critical role for union members.
 
 
 35
 The initial burden of enforcement falls upon the individual member, and the Secretary's role is defined by those efforts. The first step in enforcement, under section 402(a), is for a union member to challenge the election before the union. Once remedies available under the union constitution and by-laws have been exhausted, or have been invoked without obtaining final decision within three calendar months, the union member may, within one calendar month thereafter, file a complaint with the Secretary alleging violation of any provision of Title IV.
 
 
 36
 Once the union member's complaint has been filed with the Secretary, section 402(b) directs the Secretary to investigate it. If he finds probable cause to believe that a violation has occurred and has not been remedied, he must, within 60 days after the filing of such a complaint, bring a civil action in federal district court against the labor organization to set aside the invalid election. If the court finds a violation of Title IV it may declare the election void, and direct the conduct of a new election under the Secretary's supervision.
 
 
 37
 As the Supreme Court's review of the legislative history, in Trbovich, 404 U.S. at 532-33, 92 S.Ct. at 633, indicates:
 
 
 38
 "Congress made suit by the Secretary the exclusive post-election remedy for two principal reasons: (1) to protect unions from frivolous litigation and unnecessary judicial interference with their elections, and (2) to centralize in a single proceeding such litigation as might be warranted with respect to a single election. Title IV as enacted serves these purposes by referring all complaints to the Secretary so that he can screen out frivolous ones, and by consolidating all meritorious complaints in a single proceeding, the Secretary's suit in federal district court. The alternative proposals were rejected simply because they failed to accomplish these objectives. There is no evidence whatever that Congress was opposed to participation by union members in the litigation, so long as that participation did not interfere with the screening and centralizing functions of the Secretary."
 
 
 39
 The addition of the exhaustion requirement, section 402(a)(1), provides additional protection for the union, since unions are thereby given the opportunity to resolve union member complaints internally and may correct any election irregularities themselves. Yet, as is undeniably apparent, at the same time Congress sought to prevent frivolous litigation it created a pivotal role for union members in the enforcement process.
 
 
 40
 In fact, quick action and skillful advocacy are probably most important at the initial stages of the enforcement scheme, when infractions must be identified, a bill of particulars formulated, the internal union procedures exhausted, and a complaint drafted for presentation to the Secretary. Prompt, thorough, and proper action in the earliest stages is essential to vindication of Title IV rights, since preservation of all election defects is a prerequisite to government intervention. The Secretary may not seek to void an election on bases not raised in "some discernible fashion" by the complainant before the union, Hodgson v. Local 6799, Steel Workers, 403 U.S. 333, 340-41, 91 S.Ct. 1841, 29 L.Ed.2d 510 (1971), or which the union did not have a fair opportunity to consider and redress, Wirtz v. Local 125, Laborers,389 U.S. 477, 484, 88 S.Ct. 639, 19 L.Ed.2d 716 (1968). The clear effect of Title IV is to make the Secretary dependent upon the diligence of the union member. The Secretary's very authority to sue derives from the union member's pursuit of Title IV remedies and subsequent formal filing of a complaint with the Secretary.
 
 
 41
 Since Trbovich, union members play an even more significant role in the prosecution of Title IV violations, as intervenors. As the United States Court of Appeals for the District of Columbia Circuit noted in Local 639 :
 
 
 42
 "It is not difficult to conceive of examples of material assistance to the Secretary and the court in the vindication of the interest of the public and the union rank and file in union democracy. . . . (C)ounsel representing the intervenor may unearth material and even elusive evidence, or develop telling arguments in support of the Secretary's claims of illegality. . . . (T)he Trbovich court envisioned that intervenors would perform a role independent of the Secretary in helping the court fashion a suitable remedial order, and perhaps even assist the Secretary in supervising the conduct of the rerun. . . . (S)ound principle advises that error is more likely to be exposed when intervenors are able to secure competent counsel because of the prospect of recovering attorney's fees." (Footnotes omitted.)
 
 
 43
 543 F.2d at 384.
 
 
 44
 The notion of private participation in the prosecution of Title IV violations, notwithstanding the involvement of the Department of Labor, is fully consistent with the form and purpose of this statute. Not only is the intervenor often in a position to obtain information which might, for whatever reason, be difficult for the agency to marshall or preserve, but his perspective and the intensity of his interest allow him to contribute to the court's total understanding.[8]
 
 
 45
 Sadlowski's experiences and activities in protesting election irregularities provide a vivid illustration of obstacles which complainants and intervenors face and the insights their involvement can render. They also offer a glimpse into the actual operations of Title IV.
 
 
 46
 After suspiciously late returns from key locals, and reports of Title IV violations during the February 13, 1973 election, Sadlowski decided to contest the reported results and sought legal assistance. His need for counsel cannot be doubted. From the time, three days after the election, that Chicago attorney Leon Despres agreed to represent him, Sadlowski had only seven days to file an appeal with the USWA International Tellers, under the terms of the Union constitution. To appeal an election involving 300 locals with 130,000 members is no mean task under the most congenial circumstances, and time constraints, combined with the necessity for accurate, complete, and properly presented claims firmly underscore the fact that Sadlowski's decision to seek legal assistance in the prosecution of the challenge was neither gratuitous nor whimsical.
 
 
 47
 As noted above, Title IV of the LMRDA requires that the complaining union member exhaust internal remedies before complaining to the Secretary of Labor. But even after those procedures have been pursued, the Secretary is dependent upon the substance of the union member's complaint to the union.
 
 
 48
 During the seven-day period after he agreed to aid Sadlowski, Despres examined the USWA constitution and procedures, and the applicable legal authorities. He interviewed Sadlowski and numerous witnesses, and assisted Sadlowski in interviewing still other witnesses. He prepared affidavits and statements, and gathered documents. Sadlowski submitted his protest of the election to the USWA International Tellers on February 23, 1973. During the month between submission of his protest and the date which had been set for hearing, Despres continued to supervise efforts to obtain evidence for the hearing, and prepared materials for Sadlowski to utilize at the hearing (which Despres was not permitted to attend).
 
 
 49
 When the International Tellers upheld the results of the disputed election, and Sadlowski decided to contest their decision, Despres aided him in exhausting internal union remedies through assistance in his appeal to the International Executive Board. Sadlowski appeared before that body, presided over by USWA President I. W. Abel (who had previously campaigned for Evett). Despres was not permitted to accompany Sadlowski at the Executive Board hearing.
 
 
 50
 When the International Tellers report was upheld by the Union leadership, Sadlowski resolved to complain to the Secretary pursuant to 29 U.S.C. § 482(a), requiring that a complaint be filed within 30 days of exhaustion of union remedies leading to denial of relief. In preparation, Despres interviewed witnesses to obtain statements and conferred with Sadlowski for the purpose of preparing materials to be filed with the Department of Labor in order to induce the Secretary to challenge the election. Despres assisted Sadlowski in the preparation of a brief and argument for the Secretary of Labor, which accompanied the actual complaint filed with the Secretary. The materials and complaint presented to the Secretary totalled nearly 100 pages.
 
 
 51
 Under these circumstances, the Department of Labor relied almost exclusively upon Sadlowski's charges in conducting its investigation. The compliance officer in charge of the investigation noted that in making its inquiry the Department concentrated upon those locals at which Sadlowski alleged the most egregious violations to have occurred. Sadlowski's allegations were borne out by the Department's own investigation.
 
 
 52
 Nevertheless, the Department did not bring suit within the 60 day period required by statute, and instead agreed with the USWA in both July and August of 1973 to extensions of time within which any action might be brought. Sadlowski and Despres became understandably apprehensive about the Department inaction, in view of findings by Department investigators of wrongdoing. Concerned about the prospect of further delay, they agreed that Sadlowski should seek the assistance of a Washington, D.C. attorney, Joseph Rauh, Jr., experienced in LMRDA proceedings. Rauh agreed to assist Sadlowski and Despres.
 
 
 53
 Shortly after Rauh was retained, the Department of Labor agreed to the further extension of the time for bringing any action until November 1973. Rauh immediately protested the extension to the Department, and no further extensions were granted. Rauh familiarized himself with the election and informed the Deputy Assistant Secretary of Labor of the nature and degree of the violations which had occurred. Rauh also indicated his intention to bring suit to set aside the arbitrary inaction of the Secretary if suit were not instituted by November. Cf. Dunlop v. Bachowski, 421 U.S. 560, 95 S.Ct. 1851, 44 L.Ed.2d 377 (1975). The Secretary did institute suit challenging the District 31 election, on November 8, 1973. Sadlowski's counsel thereupon assisted him in intervening in the Secretary's action and obtaining the aid of local counsel from Washington, Pennsylvania, Kenneth Yablonski. Upon the granting of intervention Sadlowski and his counsel enlisted the aid of a younger New York attorney, Judith Schneider, to assist in the considerable task of gathering and presenting evidence.
 
 
 54
 Although the suit had been filed in November 1973, and despite Congress' apparent intention that such suits be expedited, the first significant steps in prosecution of the action occurred after Sadlowski's intervention in January 1974, and a February 1974 meeting with Department of Labor officials at which Sadlowski's attorneys urged prompt action in the case. The Department officials informed Sadlowski's attorneys at the meeting that the latter could be of valuable assistance to the Department in following up leads and in providing information relevant to the prosecution of the case. The USWA finally filed its answer to the complaints, and the Department, armed with information provided by Sadlowski's attorneys and at their urging, took its first step toward discovery: the service on the USWA of a request to produce documents. The Department also filed a motion for expedited trial and to fix the discovery calendar, which Sadlowski's attorneys supported by an extensive memorandum urging a prompt resolution of the case. In response, the USWA asserted that it would be difficult to begin discovery until August 1974.
 
 
 55
 The district court conducted a hearing on the Department's motion on March 21, 1974, and was critical of the delays both in the Department's filing of the complaint, and in the USWA's filing of its answers. Counsel for both the Department of Labor and the USWA indicated that they had tentatively agreed that discovery could begin as late as August of 1974. Sadlowski's attorneys opposed such a schedule and urged that discovery should begin immediately and be completed as soon as possible. Accepting the recommendation of Sadlowski's attorneys, the district court ordered that discovery be completed within 90 days.
 
 
 56
 Nevertheless, the only Department of Labor discovery which took place within that 90-day period turned out to be the April 1974 service of interrogatories on the USWA. Also in April, Sadlowski's attorneys were advised that settlement negotiations were taking place between the Department and the USWA. A Department official informed Sadlowski's counsel that the Department was considering USWA proposals to divide District 31 into two parts (Illinois and Indiana), and another proposal to conduct a new election, but with a reopening of nominations. Sadlowski's attorneys strongly protested these proposals.[9] The ultimate settlement agreed to by the Department did not include either proposal.
 
 
 57
 In early May 1974, Sadlowski's attorneys were advised by the Department of Labor Regional Solicitor in Chicago that he believed continued efforts by Sadlowski would materially aid in securing USWA capitulation and agreement to a new election. Also, a Department lawyer in Philadelphia told Sadlowski's lawyers that Department investigation would proceed no further. Sadlowski's counsel thereupon continued their own investigation into the improprieties in the original election, particularly into ballot frauds by local union officials, and the use of union funds for Evett's campaign. Among other activities, Sadlowski's attorneys took the depositions of Evett, and his campaign manager. They also noticed the depositions of presidents of local unions within District 31 where considerable evidence of ballot fraud was found; there were allegations of involvement by Evett's staff in those instances. In at least one local, the membership had imposed fines and suspension upon its president and tellers for vote fraud. An International Commission of USWA officials later recommended that the fines and suspensions be lifted. Sadlowski's attorneys protested this action in a telegram to the International Executive Board, which decided to reject the recommendation.
 
 
 58
 When the Department sought Sadlowski's consent to the proposed settlement agreement, in July 1974, Sadlowski's attorneys proposed changes in the settlement calculated to assure a fair election. They moved for a hearing on the Department/USWA motion for approval of the settlement, at which the suggested amendments were presented to the district court. But while urging the court to exercise its power to assure fair terms for a new election, Sadlowski's attorneys indicated that any new election, however unfair, would be preferable to further delays. Sadlowski's attorneys were successful in achieving a stipulation that there would be no changes in the boundaries of District 31, as had previously been suggested by the Department and USWA, and they convinced the court that the new election should be held before November 19, 1974, as opposed to the November 29 date proposed in the agreement which fell on Thanksgiving weekend and might well have resulted in a small turnout for the new election. In addition, Sadlowski's attorneys argued their case against a mail ballot, the use of which was ultimately abandoned by the Department.
 
 
 59
 At the same August 29, 1974 hearing the district court also made it clear that it expected Sadlowski to forward a plan for a fair election to the Department of Labor, and his counsel did forward to the Secretary an extensive application seeking orders which would insure a fair election. The Department of Labor indicated, in October 1974, the actions it had taken in response to Sadlowski's requests, and stated that it had gained the USWA's agreement to abandon the mail ballot in favor of on-site voting in the new election. The Department also required that certain staff contributions of time and money to union-backed candidates be circumscribed and carefully controlled, and that records of such contributions be maintained. In direct response to Sadlowski's request, the Department also agreed to issue an order forbidding union staff members from campaigning on union time or utilizing union facilities for campaigning. The Department also decided to order the USWA to prepare certain lists of information relating to the various locals within District 31, and to provide such information to all candidates, including Sadlowski. The record makes clear that the impetus for many of these actions was Sadlowski's urging.
 
 
 60
 As a result of further prodding, the Department of Labor held a pre-election conference in Chicago. Sadlowski's counsel succeeded in proposing and embodying numerous provisions in the rules for the upcoming election, including: a provision for custody of ballots in and accrediting of election observers by the Department of Labor; a provision requiring that the election supervisor be given the identity and addresses of various worksites (and that the same be given to Sadlowski as well); a provision for record-keeping as to contributions by staff representatives of the USWA to candidates in the election. Sadlowski's counsel later persuaded the Department to send a letter with the election rules to the effect that campaigning on union time by union staff employees was improper.
 
 
 61
 The Department of Labor also agreed with the suggestion of Sadlowski's counsel that observers be permitted at the sites to assist the Department in monitoring the election, and conceded that it alone could not enforce the election and campaigning rules. The Department therefore encouraged the filing of complaints relating to election violations, and Sadlowski's attorneys undertook to assist the Department in enforcing those rules and insuring a fair election. Sadlowski's counsel were also active in widely disseminating the rules, and encouraging union members to report violations, and they pinpointed particularly problematic procedures, and problem locals. At their urging, the Department implemented systems designed to speed the checking of voter eligibility and avoid voting card fraud and delays from too few voting lines. The final Department of Labor figures for the election were: Sadlowski 39,637 and Evett 20,158. By the time of the election, Evett had held the disputed position for over a year and one-half.
 
 
 62
 This detailed recapitulation of the actions undertaken by Sadlowski's attorneys is not in any sense intended to denigrate or detract from the enormous effort which the Department of Labor devoted to the prosecution of the violations and the conduct of a fair election. The record makes clear the many thousands of man-hours which the Department spent on this case, and we do not suggest that they were other than conscientiously and profitably expended. However, we disagree with the district court characterization of the efforts of intervenor Sadlowski's counsel as "self-serving and at the most a mere fraction of and duplicitous of the work entrusted to the Secretary by the Congress." Brennan v. United Steelworkers of America, District 31, Sadlowski, Intervenor, Civil Action No. 73-957 (W.D.Pa. December 11, 1975), reproduced in appendix at 201a-207a. As the survey above suggests, an intervenor can fulfill many functions, and the better the lawyers involved the better this scheme will function. As Local 639 indicates:
 
 
 63
 "As the Secretary's determination to take no position on this issue (of the propriety of an award of attorney's fees) suggests, allowance of attorney's fees for union member efforts in aid of the Secretary's action does not undercut the exclusivity of the administrative remedy. 'Congress, although committed to minimal intervention, was obviously equally committed to making that intervention, once warranted, effective in carrying out the basic aid of Title IV.' Wirtz v. Local 153, Glass Bottle Blowers, 389 U.S. 463, 473, 88 S.Ct. 643, 19 L.Ed.2d 705 (1968)."
 
 
 64
 543 F.2d at 385-86. The agency and the intervenor perform truly different roles, with, in our view, considerably less overlap and waste than the district court found. The Department of Labor performs a quasi-judicial, rather than a purely adversarial role in Title IV cases. Its duty is to the public, its own policies, the union interest, and the individual. In deciding whether to institute suit, what to complain of, and what to settle for, the Secretary must constantly weigh competing interests and duties. Before the Trbovich -intervenor existed, the statutory scheme involved only one party truly comporting itself in an adversarial posture: the union. But since Trbovich the "union interest" is defined by two parties with adverse viewpoints even if their interest in the union remains a common denominator. The Secretary, in this circumstance, occupies a more tenable position since he has not only his own expertise in the field, but, in addition, the benefit of the crystallization and presentation of issues and viewpoints we associate with the adversary process. The intervenor's role created by Trbovich is thus that of an adversary to the union in developing the facts and the legal issues. What the issue of statutory preclusion of the exercise of equitable powers boils down to in this context is the question of how empty a role the Supreme Court intended to create. Considering the complexities of internal union remedies, complaint to the Secretary, and recourse to the courts, and the penalties for lack of legal or technical sophistication, we cannot believe that intervenors were intended to proceed pro se. To have anticipated the depth and quality of involvement, expertise, and enterprise shown by Despres, Rauh, Yablonski and Schneider for a fee which the USWA would have the courts find themselves powerless to award would be to deny Trbovich all effect. While we do not consider the propriety of an award of attorney's fees for union member assistance in pursuing Title IV violations where suit is not brought or the complainant does not intervene, we note that courts and legislatures do not ordinarily create roles strong roles and then deny their existence by refusing to recognize the existence of the means to fulfill them effectively. Nothing has been suggested to us which indicates that the Secretary's role could be or has been threatened by Sadlowski's attorneys, and it is difficult to imagine more vigorous or skillful action. Nothing in either the statute or the legislative history of the LMRDA suggests to us the preclusion of the courts' traditional equitable power to provide complete relief in light of the statutory purpose.
 
 
 65
 We hold that an award of equitable relief is wholly consistent with Title IV of the LMRDA. Our consideration of the basis for such an award in this case, "common benefit," follows.
 
 
 66
 III. "COMMON BENEFIT"
 
 
 67
 Although the traditional American rule disfavors the award of attorney's fees in the absence of statutory or contractual authorization, the federal courts have the inherent power to fashion such equitable relief, payable by those enjoying a common benefit, under certain circumstances, see, Hall v. Cole, 412 U.S. at 4-5, 93 S.Ct. 1943; Sprague v. Ticonic National Bank, 307 U.S. 161, 166, 59 S.Ct. 777, 83 L.Ed. 1184 (1939), and have not hesitated to use this power where "overriding considerations indicate the need for such a recovery," Mills v. Electric Auto-Lite Co., 396 U.S. 375, 391-92, 90 S.Ct. 616, 625, 24 L.Ed.2d 593 (1970); see Fleischmann, 386 U.S. at 718, 87 S.Ct. 1404. The courts have been particularly sensitive to the need and desirability of the allowance of attorney's fees in cases where a plaintiff's prosecution of an action confers "a substantial benefit on the members of an ascertainable class, and where the court's jurisdiction over the subject matter of the suit makes possible an award that will operate to spread the costs proportionately among them," Mills, 396 U.S. at 393-94, 90 S.Ct. at 626. In such cases, "fee-shifting" has been deemed appropriate because "to allow the others to obtain full benefit from the plaintiff's efforts without contributing equally to the litigation expenses would be to enrich the others unjustly at the plaintiff's expense." Id. at 392, 90 S.Ct. at 625; Hall v. Cole, 412 U.S. at 6, 93 S.Ct. 1943. The vitality of this "common benefit" exception has been affirmed recently by the Supreme Court in Alyeska Pipeline Co. v. Wilderness Society, 421 U.S. 240, 257-59, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975).
 
 
 68
 As the Alyeska Court stated, the roots of this exception lie in "the historic power of equity to permit the trustee of a fund or property, or a party preserving or recovering a fund for the benefit of others in addition to himself, to recover his costs, including his attorney's fees from the fund or property itself or directly from the other parties enjoying the benefit. That rule has been consistently followed." Id. at 257-58, 95 S.Ct. at 1621, citing Trustees v. Greenough, 105 U.S. 527, 26 L.Ed. 1157 (1882). As pointed out by Judge Leventhal in Local 639, 543 F.2d at 382-83:
 
 
 69
 "This 'historic power of equity,' essentially an application of the court's power when seized of jurisdiction over a case to award complete relief so as to prevent unjust enrichment, has developed well beyond the 'common fund' limitation of Greenough. In Sprague v. Ticonic Nat'l Bank, 307 U.S. 161, 166, 59 S.Ct. 777, 83 L.Ed. 1184 (1939), the Court recognized power in the district court to reimburse a plaintiff's litigation expenses even though she sued for her own benefit and not for a class, because her success would by operation of stare decisis entitle others to recover out of the same assets. There is no prerequisite of pecuniary benefit, as was made clear by Mills v. Electric Auto-Lite Co., 396 U.S. 375, 392-94, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970), a case involving a judicially implied right of action under the Securities Exchange Act of 1934 to challenge materially false or misleading proxy solicitation.[29] Hall v. Cole, 412 U.S. 1, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973), extends Mills to an express statutory cause of action.
 
 
 70
 29. Mills permits 'depart(ures) further from the traditional metes and bounds of the (common fund) doctrine' where 'litigation has conferred a substantial benefit on the members of an ascertainable class, and where the court's jurisdiction over the subject matter of the suit makes possible an award that will operate to spread the costs among them.' 396 U.S. at 393-94, 90 S.Ct. at 626.
 
 
 71
 "This development remains undisturbed after Alyeska because the 'common benefit' rational was not involved in that case,[30] and the Court made clear that 'Congress has not repudiated the judicially fashioned exceptions to the general rule against allowing substantial attorney fees.' 421 U.S. at 259-60, 95 S.Ct. at 1623. See also F. D. Rich Co. v. Industrial Lumber Co., 417 U.S. 116, 129-30 & n. 18, 94 S.Ct. 2157, 40 L.Ed.2d 703 (1974).[31]
 
 
 72
 30. See 421 U.S. at 245, 259-60, 95 S.Ct. 1612, noting that this court's decision in Alyeska disclaimed reliance on the traditional equitable exceptions of 'common benefit' and 'bad faith.' Wilderness Society v. Morton, 161 U.S.App.D.C. 446, 449, 495 F.2d 1026, 1029 (en banc, 1974).
 
 
 73
 31. For examples of post-Alyeska 'common benefit' decisions, see National Treasury Employees v. Nixon, 172 U.S.App.D.C. 217, 521 F.2d 317 (1975) (mandamus action to require the President to grant pay adjustments required by statute); Swanson v. American Consumer Indus., Inc., 517 F.2d 555 (7th Cir. 1975) (stockholder derivative suit and class action); Harrison v. United Transp. Union, 530 F.2d 558 (4th Cir. 1975) (suit by railroad conductor against union for breach of duty of fair representation)."The issue here is whether the 'common benefit' rationale may be applied to the case of union member intervention in a suit brought by the Secretary to enforce electoral rights and maintain the integrity of a union election. The appropriateness of 'fee-shifting' in the union democracy context suggests an affirmative answer, unless Congress can be said to have evidenced a purpose to bar the award of such fees."
 
 
 74
 Mills, supra, makes clear that the "fact that this suit has not yet produced, and may never produce, a monetary recovery from which the fees could be paid does not preclude an award based on this (common benefit) rationale," 396 U.S. at 392, 90 S.Ct. at 625 despite the fact that the early cases based recovery upon the production or preservation of a "common fund." However, Mills involved a judicially implied right of action under the Securities Exchange Act of 1934 to challenge materially false or misleading proxy solicitation, and Hall v. Cole provides the connecting link to this case, since it extended Mills to a statutorily created cause of action under the LMRDA.
 
 
 75
 Alyeska has no effect on the development or application of the "common benefit" exception, since it was not an element of that case, and, as the Supreme Court stated: "Congress has not repudiated the judicially fashioned exceptions to the general rule against allowing substantial attorney's fees." 421 U.S. at 259-60, 95 S.Ct. at 1623.
 
 
 76
 As Judge Leventhal recognized in Local 639:
 
 
 77
 "With respect to LMRDA, the courts have uniformly applied a 'common benefit' analysis to award attorney's fees to private litigants. The Supreme Court in Hall v. Cole, . . . endorsing earlier decisions of the Third Circuit (Gartner v. Soloner, 384 F.2d 348 (3d Cir. 1967), cert. denied, 390 U.S. 1040, 88 S.Ct. 1633, 20 L.Ed.2d 302 (1968)) and this court, held that attorney's fees may be awarded for suits brought to enforce the 'Bill of Rights' guarantees of Title I of LMRDA. This court's decision permitted the recovery of attorney's fees for a suit under Title V, which places union officials under federally defined fiduciary obligations. Bakery & Confectionary Workers Int'l Union v. Ratner, 118 U.S.App.D.C. 269, 335 F.2d 691 (1964). Ratner was extended by this court to a suit brought under section 401(c), the only privately enforceable provision in Title IV. Yablonski v. United Mine Workers, 151 U.S.App.D.C. 253, 466 F.2d 424 (1972), cert. denied, 412 U.S. 918, 93 S.Ct. 2729, 37 L.Ed.2d 144 (1973). And, recently, the Fifth Circuit applied the reasoning of these decisions to a suit brought under Title III, which regulates union trusteeships, a provision enforceable by either the Secretary or union members directly. McDonald v. Oliver, 525 F.2d 1217 (5th Cir. 1976).
 
 
 78
 "Significantly, in none of these decisions was there a statutory provision that expressly authorized the award made. Rather, the governing rationale was that union members by bringing suits against their union help vindicate the statutory policy in favor of union democracy which necessarily redounds to the benefit of the entire membership." (footnotes omitted.)
 
 
 79
 543 F.2d at 382-83. We have no doubt that this statute was intended to provide union members with protection from the type of attempts to thwart the wishes of union members and impair union democracy which appear to have occurred in this case. The dissent makes the remarkable statement (page 614) that no proof is cited for the facts stated in this opinion, in spite of repeated references in this opinion (see pp. 591, 601-603, 607) to the unchallenged and uncontradicted Verified Application for Attorneys' Fees (89a-146a). We note that the Verified Application contained undenied statements that Sadlowski's opponent was supported by the union leadership (see 90a, citing Abel Deposition at 5-7, and note 2 above);9a that union staff members were instructed to contribute to the Evett campaign in specified amounts9b and campaigned for Evett on union time and using union facilities, even to the point of neglecting union duties (see 112a); that during the first election union officials refused to inform Sadlowski of the locations of work sites and polling places so that he was limited in placing observers at the polls (see 90a); that Department of Labor investigators found the "very serious violation" of lack of secrecy in the voting at many locals (see 95a); that Sadlowski received widespread reports of ballot frauds, illegal electioneering, deprivation of secret ballot, interference with observers, and other LMRDA violations (see 90a); that the Secretary found basis for a charge in his complaint that moneys received by way of dues, assessments or similar levies were applied to promote the candidacy of Samuel Evett (see 104a, including note 33; see also P XIII of Complaint filed on November 8, 1973, by the Secretary as Document No. 1 in Civil Action No. 73-0957 (W.D.Pa.)); and that in Local 1066 the tellers had been found guilty of vote fraud.[10] I. W. Abel, President of the USWA, testified as follows in a deposition (Document No. 62B in Civil No. 73-0957B (W.D.Pa.), at page 38):"Q. (Mr. Rauh) And you feel, Mr. Sadlowski shouldn't have gone to the government even though there was ballot box stuffing, Mr. Abel?
 
 
 80
 "A. (Mr. Abel) Correct. Correct."
 
 
 81
 The Verified Application also alleges the following at 116a:
 
 
 82
 "The USWA has not been a neutral party in these proceedings. Evett was the candidate of the 'official family' the Administration of the USWA. Abel Deposition, pp. 5-7. During the pre-election conference the views of Evett and the USWA never diverged.
 
 
 83
 "In the 1973 election there were numerous instances of double shipments of ballots and unaccounted-for ballots."
 
 
 84
 No counter-affidavit was filed by the USWA challenging or contradicting the sworn allegations of the above Verified Application for Attorneys' Fees. The union filed a Motion to Dismiss such application, stating, inter alia, at 147a-148a:
 
 
 85
 "As a matter of law, the aforementioned Application fails to state a proper claim for attorneys' fees and therefore should be dismissed on its face. Since such a dismissal would obviate the need for massive discovery and an evidentiary hearing on said Application, USWA respectfully suggests that discovery not be commenced pending disposition of this Motion."
 
 
 86
 In Kahan v. Rosenstiel, 424 F.2d 161, 164 (3d Cir.), cert. denied sub nom. Glen Alden Corp. v. Kahan, 398 U.S. 950, 90 S.Ct. 1870, 26 L.Ed.2d 290 (1970), this court said: "(b)ecause the District Court disposed of the matter on a motion to dismiss, the facts alleged in plaintiff's petition for counsel fees and his amended complaint in the underlying suit must be accepted as true."10a It is clear that the USWA was in the best position to deny the above and other allegations of the Verified Application for Attorneys' Fees and the depositions, if they could have done so. USWA elected not to challenge the Verified Application and to file its Motion to Dismiss. This Court has recently reaffirmed the rule applicable to this situation:
 
 
 87
 "Under such circumstances, we must take all of the well pleaded allegations of the complaint as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any circumstances, the plaintiff might be entitled to any relief.[4]
 
 
 88
 4. See, e. g., Conley v. Gibson, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); Polite v. Diehl, 507 F.2d 119, 124 n.2 (3d Cir. 1974); Quinones v. United States, 492 F.2d 1269, 1273 (3d Cir. 1974); Curtis v. Everette, 489 F.2d 516 (3d Cir. 1973), cert. denied, 416 U.S. 995, 94 S.Ct. 2409, 40 L.Ed.2d 774 (1974); Melo-Sonics Corp. v. Cropp, 342 F.2d 856 (3d Cir. 1965)."
 
 
 89
 Helstoski v. Goldstein, 552 F.2d 564 at page 565 (3d Cir. 1977). In view of the facts in this record, the following language in Local 639 is particularly applicable:
 
 
 90
 "The statute is expressly aimed at protecting union members from the corruption and electoral unresponsiveness of their leadership. 'Fee-shifting' is particularly appropriate because of the close match between the party assessed and the beneficiary of the litigation. Indeed, the benefited class, its contours shaped by the union's self-description and its finances based on per capita payments, fits the paradigm for 'common benefit' cases."
 
 
 91
 543 F.2d at 383. And we hold that absent congressional circumscription of the courts' power to award equitable relief in the form of "fee-shifting," the allowance of attorney's fees is justified under Title IV when a "common benefit" has been conferred.
 
 
 92
 The overriding considerations in evaluation of "common benefit" claims are: whether the benefits may be traced with some accuracy; whether the class of beneficiaries is readily identifiable; and whether there is a reasonable basis for confidence that the costs may be shifted with some precision to those benefiting.
 
 
 93
 The district court, adopting the Magistrate's Report,[11] held that even though the intervenor argued that his actions vindicated the interests of all union members in securing free elections, "it strains belief to conclude that a benefit bestowed upon District 31, whose membership comprises approximately 9% of the entire union membership, inures to the benefit of the steelworkers as a whole." And the Magistrate went on to say that even if the latter proposition were true, "Congress has ascribed the task of insuring the propriety of union elections to the Secretary. The individual may only seek to vindicate his own limited personal interest." We have concluded that the district court incorrectly found that no common benefit was conferred upon the USWA as a whole, and improperly denied Sadlowski's application for assessment of attorney's fees against the Union treasury.
 
 
 94
 The Hall Court, after recognizing that Congress enacted the LMRDA to insure minimum standards of democratic process and stem abuses which included breach of trust, corruption, and disregard of the rights of individual employees, stated that by vindicating his own right to free speech under Title I:
 
 
 95
 "the successful litigant dispels the 'chill' cast upon the rights of others. Indeed, to the extent that such lawsuits contribute to the preservation of union democracy, they frequently prove beneficial 'not only in the immediate impact of the results achieved but in their implications for the future conduct of the union's affairs.' Yablonski v. United Mine Workers of America, 151 U.S.App.D.C. 253, 466 F.2d 424, 431 (1972). Thus, as in Mills, reimbursement of respondent's attorneys' fees out of the union treasury simply shifts the costs of litigation to 'the class that has benefitted from them and that would have had to pay them had it brought the suit.' " (Footnote omitted.)
 
 
 96
 412 U.S. at 8-9, 93 S.Ct. at 1948. Hall, then, makes clear that to the extent that prosecution of LMRDA violations supports union democracy, such activity confers direct and substantial benefit upon the entire union membership. In our view, the entire thrust and effect of Sadlowski's prosecution of these Title IV violations was vindication of democratic process in USWA elections, and his actions redounded to the common benefit of the whole Union. Title IV is specifically aimed at remedying interferences with union elections like those which occurred here. In this regard we note the particularly egregious abuses of the electoral process in this case. Sadlowski was not merely opposed by a member of the USWA "official family," Union officers and agents actively campaigned against him. The depth of Sadlowski's favor with the rank and file of District 31 is evident from the fact that when a fair election was finally held, votes ran nearly two-to-one in his favor. Union leadership having exerted such effort to oppose the candidacy of a single insurgent, it would be naive to assume that similar election "irregularities" have not or would not spread to other districts and locals where a member of the "official family" ran opposed. Had such tactics been successful in District 31, there appears to be little doubt that they would have been employed again, and again. The determination and vigor of this union member served to insure to all union members the rights which Congress intended be theirs, and in this instance union democracy would have been a hollow promise without Sadlowski's involvement. The mere fact that Sadlowski himself benefited from his prosecution of this action neither negates the benefit to the union nor prejudices his right to claim attorney's fees. Hall, id.
 
 
 97
 Sadlowski's contribution to the "common benefit" of the USWA membership is not, however, limited to vindication of union democracy. The directors of the various Union districts serve on the International Executive Board: the USWA's governing body. Interference with the election of the District 31 director cannot be said to have merely localized impact on the union membership. Despite the fact that the main function of a district director is to represent a district, each director also plays a significant role in representing the interests of every union member. The International Executive Board is charged with enforcing the Union constitution, directing the affairs of the International, and overseeing the financial affairs of the Union. The International Executive Board also plays an important internal political function, since it decides when elections will be held, and also establishes the territorial boundaries of the various union districts.
 
 
 98
 The magistrate and the district court were, however, concerned about other elements of the "common benefit" determination as well. The Alyeska Court did state that in the Supreme Court's "common-fund and common-benefit decisions, the classes of beneficiaries were small in number." 421 U.S. at 265 n.39, 95 S.Ct. at 1625. The magistrate apparently understood that language to mean absolute numbers, and indicated that a class of 1,400,000 was too large to have been benefited. Like any other statement, that one must be viewed in context. Given this context, mere size does not support the contention that the class of USWA members did not receive a common benefit from Sadlowski's activity. Mills, for example, involved a beneficiary class of 8,987, 403 F.2d 429, 432 (7th Cir. 1968). Hall v. Cole, supra, involved a class of approximately 85,000 union members, and Yablonski v. United Mine Workers of America, supra, involved a class of approximately 250,000. In our view, the requirement of identifiability weighs heavily in this determination, and USWA members, though numerous, are readily identifiable as the benefited group. The Supreme Court no doubt wished to clarify the notion that although very much larger groups might be said to benefit from the prosecution of certain actions just as every union member, and every individual might be said to benefit from vindication of union democracy the doctrine is not to be extended to ludicrous dimensions.
 
 
 99
 The magistrate also erred in holding that attorney's fees would unfairly burden all Union members since, in its view, the primary benefit fell to District 31, while the USWA treasury supported by 1,400,000 members would be the source of payment. This record requires the determination that the entire Union membership benefited from Sadlowski's tenacious handling of this suit, and we note that the benefit conferred in this case may well justify whatever "burden" is involved. But we would point out, again, that in this case the so-called "burden," and its size, were in large part attributable to the USWA defense of a meritless position. The very purpose of the exhaustion requirement of Title IV is to give the union the opportunity to correct irregularities. Where the union faithfully performs its obligation to obey the LMRDA mandate, neither complainant nor union would require much legal assistance. Here, improper attempts to oppose Sadlowski directly created the need for legal assistance, and the tenacity of this opposition contributed directly to the size of "burden." While we fully agree that, in view of the extreme abuses which occurred, almost all the expenses for legal services incurred by all parties were wasteful and should never have been necessary, there is no reason to penalize the intervenor who performed his function correctly and well. If the rank and file is dissatisfied, their recourse lies with the Union leaders who were responsible. The position that the USWA treasury is an improper fund from which to make an award, since the primary benefit was to District 31, fails for like reasons.[12] While it cannot be denied that the greatest benefit was conferred upon Union members in that district, we note that suit was brought against the USWA, rather than District 31, precisely because districts are not labor organizations within the meaning of 29 U.S.C. § 402(i), and the parent union is the suable entity. There is, moreover, no district treasury, since all dues and fees are contributed directly to the USWA and later some funds are dispersed to the districts. To hold that attorney's fees must be recovered from a fund created by those who received the greatest benefit, rather than from a fund created by those who received a legally sufficient and significant benefit, would be tantamount to denial of that recovery. But more than that, such a holding would effectively allow unions to insulate themselves from union member attempts to prosecute Title IV violations. By creating an internal structure that comingles funds and denies their identifiability to an individual unit, unions could preclude recovery of attorney's fees. Such action would thwart the process of complaint and productive intervention by union members, and deny effect to the policies enunciated by the LMRDA and Trbovich.
 
 
 100
 We note that although the district court specifically adopted the magistrate's report, the sweeping conclusions of law which are contained in its Memorandum (see note 1 above) appear to differ from the more completely reasoned approach of the magistrate.[13] Our particular concern in this case is the failure of the district court to make clear the basis for its decision. Because of the inconsistencies between the report of the magistrate and the Memorandum of the district court, we are unable to determine the extent to which it relied on the reasoning of the United States Magistrate in reaching its decision, as opposed to its reliance on the sweeping legal conclusions quoted in note 1 above. We have concluded that those legal conclusions of the district court are an improper basis for decision on this record.
 
 
 101
 We believe that a case involving public policy considerations of the great importance of those concerned here requires a reasoned statement by the district court of the exact basis for its determinations on the specific record before it. For example, we do not know whether specific consideration was given by the district court to the serious allegations of fraud in the elective process to which we have referred at 601-604, note 10, or whether the hearing judge considered that irrespective of outrageously fraudulent and corrupt elective processes, a defeated candidate for high union office could never recover attorneys' fees solely because District 31 members received more benefit than the general union membership.[14] We reject such a basis for the district court's December 11, 1975 Order.
 
 
 102
 The second quotation from the district court Memorandum, at note 1, appears to overlook completely the holding of the Supreme Court of the United States in Mills, supra, that the absence of a "fund or property" does not preclude the application of the common benefit rationale. See page 601 above.[15]
 
 
 103
 The facts of this case illustrate graphically the abuses of power which the LMRDA was enacted to prevent. The Union hierarchy, rather than remaining neutral and maintaining the integrity of the electoral process, closed ranks around its own candidate to prevent an independent contender from gaining a foothold. The vigorous campaign for vindication of congressionally created rights mounted by this intervenor appears to have conferred a "common benefit" upon the USWA as a whole.
 
 
 104
 In view of our holding that the courts have the power to fashion equitable awards based upon the "common benefit" theory, under Title IV, the district court order will be reversed and the case remanded for reconsideration. On this question of whether a common benefit was conferred, the district court should carefully consider the unrebutted factual allegations of corruption detailed in the Verified Application, to which we refer above, not only in view of this candidate's successful campaign to vindicate union democracy, and the principles enunciated both in Local 639 and in this opinion, but particularly in light of the Supreme Court decisions in Mills and Hall v. Cole.[16]
 
 IV. ON REMAND
 
 105
 It would appear that the discussion of common benefit, to the extent that it existed, in the Memorandum of the district court was dictum, in view of its conclusion that there was no power under Title IV to award attorneys' fees. Having held that the award of equitable relief is not precluded by Title IV of the LMRDA, and that the intervenor may be entitled to attorneys' fees based upon a common benefit conferred upon the USWA, the district court order and opinion will be reversed, and the case remanded for findings and reconsideration of the liability of the defendant for attorneys' fees.
 
 
 106
 Whether an award is warranted and, if so, the amount of such award, is a matter for initial determination by the district court in the light of the broader application of the "common benefit" rationale required by the above cited opinions.
 
 
 107
 The standards for determining the amount of the award of attorneys' fees have been developed in previous decisions of this Court.[17] The discretion of the district court, aided by the views of the Secretary, will permit reasoned appraisal of the benefits from the legal services performed by intervenor's counsel. However, although union members should not be required to pay for unnecessary duplication of legal services, it should not be presumed that mere duplication of effort by either counsel for Sadlowski or counsel for the Department of Labor was unnecessary or non-beneficial.[18]APPENDIX
 
 TITLE IV-ELECTIONS
 Terms of Office; Election Procedures
 
 108
 (29 U.S.C. § 481)
 
 
 109
 Sec. 401. (a) Every national or international labor organization, except a federation of national or international labor organizations, shall elect its officers not less often then once every five years either by secret ballot among the members in good standing or at a convention of delegates chosen by secret ballot.
 
 
 110
 (b) Every local labor organization shall elect its officers not less often than once every three years by secret ballot among the members in good standing.
 
 
 111
 (c) Every national or international labor organization, except a federation of national or international labor organizations, and every local labor organization, and its officers, shall be under a duty, enforceable at the suit of any bona fide candidate for office in such labor organization in the district court of the United States in which such labor organization maintains its principal office, to comply with all reasonable requests of any candidate to distribute by mail or otherwise at the candidate's expense campaign literature in aid of such person's candidacy to all members in good standing of such labor organization and to refrain from discrimination in favor of or against any candidate with respect to the use of lists of members, and whenever such labor organizations or its officers authorize the distribution by mail or otherwise to members of campaign literature on behalf of any candidate or of the labor organization itself with reference to such election, similar distribution at the request of any other bona fide candidate shall be made by such labor organization and its officers, with equal treatment as to the expense of such distribution. Every bona fide candidate shall have the right, once within 30 days prior to an election of a labor organization in which he is a candidate, to inspect a list containing the names and last known addresses of all members of the labor organization who are subject to a collective bargaining agreement requiring membership therein as a condition of employment, which list shall be maintained and kept at the principal office of such labor organization by a designated official thereof. Adequate safeguards to insure a fair election shall be provided, including the right of any candidate to have an observer at the polls and at the counting of the ballots.
 
 
 112
 (d) Officers of intermediate bodies, such as general committees, system boards, joint boards, or joint councils, shall be elected not less often than once every four years by secret ballot among the members in good standing or by labor organization officers representative of such members who have been elected by secret ballot.
 
 
 113
 (e) In any election required by this section which is to be held by secret ballot a reasonable opportunity shall be given for the nomination of candidates and every member in good standing shall be eligible to be a candidate and to hold office (subject to section 504 and to reasonable qualifications uniformly imposed) and shall have the right to vote for or otherwise support the candidate or candidates of his choice, without being subject to penalty, discipline, or improper interference or reprisal of any kind by such organization or any member thereof. Not less than fifteen days prior to the election notice thereof shall be mailed to each member at his last known home address. Each member in good standing shall be entitled to one vote. No member whose dues have been withheld by his employer for payment to such organization pursuant to his voluntary authorization provided for in a collective bargaining agreement shall be declared ineligible to vote or be a candidate for office in such organization by reason of alleged delay or default in the payment of dues. The votes cast by members of each local labor organization shall be counted, and the results published, separately. The election officials designated in the constitution and bylaws or the secretary, if no other official is designated, shall preserve for one year the ballots and all other records pertaining to the election. The election shall be conducted in accordance with the constitution and bylaws of such organization insofar as they are not inconsistent with the provisions of this title.
 
 
 114
 (g) No moneys received by any labor organization by way of dues, assessment, or similar levy, and no moneys of an employer shall be contributed or applied to promote the candidacy of any person in an election subject to the provisions of this title. Such moneys of a labor organization may be utilized for notices, factual statements of issues not involving candidates, and other expenses necessary for the holding of an election.
 
 Enforcement
 
 115
 (29 U.S.C. § 482)
 
 
 116
 Sec. 402. (a) A member of a labor organization
 
 
 117
 (1) who has exhausted the remedies available under the constitution and bylaws of such organization and of any parent body, or
 
 
 118
 (2) who has invoked such available remedies without obtaining a final decision within three calendar months after their invocation,
 
 
 119
 may file a complaint with the Secretary within one calendar month thereafter alleging the violation of any provision of section 401 (including violation of the constitution and bylaws of the labor organization pertaining to the election and removal of officers). The challenged election shall be presumed valid pending a final decision thereon (as hereinafter provided) and in the interim the affairs of the organization shall be conducted by the officers elected or in such other manner as its constitution and bylaws may provide.
 
 
 120
 (b) The Secretary shall investigate such complaint and, if he finds probable cause to believe that a violation of this title has occurred and has not been remedied, he shall, within sixty days after the filing of such complaint, bring a civil action against the labor organization as an entity in the district court of the United States in which such labor organization maintains its principal office to set aside the invalid election, if any, and to direct the conduct of an election or hearing and vote upon the removal of officers under the supervision of the Secretary and in accordance with the provisions of this title and such rules and regulations as the Secretary may prescribe. The court shall have power to take such action as it deems proper to preserve the assets of the labor organization,
 
 
 121
 (c) If, upon a preponderance of the evidence after a trial upon the merits, the court finds
 
 
 122
 (1) that an election has not been held within the time prescribed by section 401, or
 
 
 123
 (2) that the violation of section 401 may have affected the outcome of an election,
 
 
 124
 the court shall declare the election, if any, to be void and direct the conduct of a new election under supervision of the Secretary and, so far as lawful and practicable, in conformity with the constitution and bylaws of the labor organization. The Secretary shall promptly certify to the court the names of the persons elected, and the court shall thereupon enter a decree declaring such persons to be the officers of the labor organization. If the proceeding is for the removal of officers pursuant to subsection (h) of section 401, the Secretary shall certify the results of the vote and the court shall enter a decree declaring whether such persons have been removed as officers of the labor organization.
 
 
 125
 (d) An order directing an election, dismissing a complaint, or designating elected officers of a labor organization shall be appealable in the same manner as the final judgment in a civil action, but an order directing an election shall not be stayed pending appeal.
 
 Application of Other Laws
 
 126
 (29 U.S.C. § 483)
 
 
 127
 Sec. 403. . . . The remedy provided by this title for challenging an election already conducted shall be exclusive.
 
 
 128
 ALDISERT, Circuit Judge, dissenting.
 
 
 129
 This appeal presents the question whether the entire membership of the United Steelworkers of America should pay private attorney's fees[1] for representation of a candidate in an election dispute over the position of District Director for the USWA district in Illinois and Indiana. Appellant Edward Sadlowski lost the election and, after exhausting his union remedies, filed a complaint with the Secretary of Labor seeking to persuade the Secretary to institute court proceedings to upset the election. After investigating Sadlowski's claims, the Secretary brought an action challenging the election. Sadlowski was permitted to intervene, a settlement was reached, and a new election was held in which Sadlowski won the District Director position, which pays an annual salary of $35,000. The majority holds that the international union treasury should pay Sadlowski's counsel fees incurred in connection with the election dispute. I disagree and would affirm the judgment of the district court.
 
 
 130
 The majority recognizes that Alyeska Pipeline Co. v. Wilderness Society, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), which reaffirmed the American Rule respecting the award of attorney's fees, controls this case. But through some very ambitious judicial lawmaking they discover implied authorization in Title IV of the Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C. §§ 481-483, to depart from that rule. Although Title IV does not provide for private attorney's fees and, indeed, may not be enforced by private action, the Supreme Court has allowed private parties to intervene on a limited basis when an action is brought by the Secretary. Trbovich v. United Mine Workers of America, 404 U.S. 528, 92 S.Ct. 630, 30 L.Ed.2d 686 (1972). From this limited, judicial exception to the wholly governmental enforcement scheme of Title IV, the majority concludes that Congress really intended, despite its silence on the point, to allow attorney's fees awards to intervenors in the government proceedings. Having cleared such a high jurisprudential hurdle, the majority has little difficulty negotiating the lesser legal and factual obstacles in its course. It goes further to conclude that Sadlowski's victory in the rerun of the local district election conferred a common benefit on the international union's entire membership throughout the United States and Canada, and that this benefit justifies imposition of attorney's fees under the common benefit exception to the general rule of Alyeska. See Trustees v. Greenough, 105 U.S. 527, 26 L.Ed. 1157 (1882). I disagree with both points of the majority's logic.
 
 I.
 
 131
 Title IV of the LMRDA was not enacted in a vacuum; it is one of five titles in a unitary legislative schema. Titles I, II, III, and V rely on private enforcement by individual union members and allow the award of attorney's fees, either expressly or by logical implication from the provision for equitable relief. See Alyeska, supra; Hall v. Cole, 412 U.S. 1, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973). Thus, Congress provided that Title I, the bill of rights of union members, could be enforced by civil suits brought by individual union members "for such relief (including injunctions) as may be appropriate." 29 U.S.C. § 412. In Title II, relating to reporting, Congress also relied on union members for enforcement and specifically provided: "The court in such action may, in its discretion, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action." 29 U.S.C. § 431(c). In Title III, which concerns union trusteeships, Congress again relied on the individual union members, conferring upon them a civil cause of action "for such relief (including injunctions) as may be appropriate." 29 U.S.C. § 464(a). And in Title V, which sets forth fiduciary responsibilities of union officers, Congress not only gave union members a right to sue for damages, accounting or other appropriate relief, but it specified that the trial judge "may allot a reasonable part of the recovery in any action under this subsection to pay the fees of counsel prosecuting the suit at the instance of the member of the labor organization." 29 U.S.C. § 501(b).
 
 
 132
 The enforcement provisions of Title IV contrast sharply with those of the other Titles. Title IV does not contemplate private enforcement. Indeed, the right to file suit to enforce Title IV is limited to the Secretary, 29 U.S.C. § 482(b), and this remedy is declared to be exclusive. 29 U.S.C. § 483. There is no express or implied provision for attorney's fees for private enforcement of Title IV because no private enforcement is contemplated or allowed. Trbovich v. United Mine Workers of America, supra, 404 U.S. at 532, 92 S.Ct. at 633, tersely stated the reasons for the special and limited enforcement provisions of Title IV:
 
 
 133
 A review of the legislative history shows that Congress made suit by the Secretary the exclusive post-election remedy for two principal reasons: (1) to protect unions from frivolous litigation and unnecessary judicial interference with their elections, and (2) to centralize in a single proceeding such litigation as might be warranted with respect to a single election. Title IV as enacted serves these purposes by referring all complaints to the Secretary so that he can screen out frivolous ones, and by consolidating all meritorious complaints in a single proceeding, the Secretary's suit in federal district court. The alternative proposals were rejected simply because they failed to accomplish these objectives.
 
 
 134
 As the Supreme Court noted in Trbovich, Congress rejected a provision which would have allowed individual union members to bring actions to enforce Title IV. 404 U.S. at 532-36, 92 S.Ct. 630. In Title IV litigation "the Secretary of Labor in effect becomes the union member's lawyer." Ibid. at 539, 92 S.Ct. at 636 (quoting Senator Kennedy). I do not read the statute or its legislative history as contrary to the limited right of private intervention which Trbovich established. But where Congress definitely rejected private litigation as a means of enforcing Title IV, it is difficult for me to grasp how Congress, at the same time, could have intended that courts award attorney's fees to private counsel in connection with Title IV litigation.
 
 
 135
 Holmes said that "judges do and must legislate, but they can do so only interstitially; they are confined from molar to molecular motions." Southern Pacific Co. v. Jensen, 244 U.S. 205, 221, 37 S.Ct. 524, 531, 61 L.Ed. 1086 (1917). In this case, I find the majority's motion to be molar. They leap from careful statutory language that excludes private enforcement, to the circumscribed right of intervention which Trbovich allows "so long as that intervention is limited to the claims of illegality presented by the Secretary's complaint." 404 U.S. at 537, 92 S.Ct. at 636. Without getting a purchase on the narrow rationale of Trbovich, they then vault into the jurisprudential stratosphere to conclude that Congress intended that private attorney's fees would be awarded in connection with litigation that Congress ordered to be carried out exclusively by the Secretary of Labor.
 
 
 136
 I have set forth my views on the legitimacy and necessity for judicial lawmaking elsewhere.[2] And I am quick to recognize that the precise boundaries of judicial lawmaking are often difficult to ascertain. But "(w) hen a cause of action has been created by statute which expressly provides the remedies for vindication of the cause, other remedies should not readily be implied." Fleischmann Corp. v. Maier Brewing, 386 U.S. 714, 720, 87 S.Ct. 1404, 1408, 18 L.Ed.2d 475 (1967). A fortiori, an authorization of attorney's fees for activity outside the remedial schema of the statute should not readily be implied. This is particularly true in view of Alyeska's recent, vigorous reaffirmation of the vitality of the American Rule:
 
 
 137
 In the United States, the prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser. We are asked to fashion a far-reaching exception to this "American rule"; but having considered its origin and development, we are convinced that it would be inappropriate for the Judiciary, without legislative guidance, to reallocate the burdens of litigation in the manner and to the extent urged by respondents and approved by the Court of Appeals.
 
 
 138
 421 U.S. at 247, 95 S.Ct. at 1616.
 
 
 139
 The majority has done what the Supreme Court refused to do in Alyeska : they have fashioned a far-reaching exception to the American Rule. Whatever precepts of statutory construction I apply the Mischief Rule, the Golden Rule, the Literal Rule, the Plain Meaning Rule, or interpretations based on the legislative history I cannot interpret Title IV as allowing such a result. The majority's reading, in my view, is reminiscent of dicto simpliciter, the fallacy of accident. It has not misapplied the general rule to an exceptional case, but has misapplied a limited exception to that which fits the general rule. The exception begins to take on the potency of the general rule. I am as unwilling to engage in such an inversion of the law as I am disinclined to join in the majority's adventure into the legislative cosmos.
 
 II.
 
 140
 My resolution of the threshold statutory issue is sufficient to affirm the district court. In addition, however, I do not agree with the majority's second theory that the consensual agreement to a new election for District Director in Illinois and Indiana conferred a common benefit upon the entire membership of the United Steelworkers of America.
 
 
 141
 No court made findings as to the conduct of the first election.[3] Indeed, no court ordered a new election in Sadlowski's district. Not only were the allegations regarding the first election unlitigated, but the settlement agreement approved by the district court prior to the second election contained a disclaimer of any concession by the parties as to the truth of the allegations. Nevertheless, the majority makes three interesting statements, each of which takes sustenance from the unlitigated allegations, and upon which the majority postulate their common benefit theory:
 
 
 142
 (1) In our view, the entire thrust and effect of Sadlowski's prosecution of these Title IV violations was vindication of democratic process in USWA elections, and his actions redounded to the common benefit of the whole Union.
 
 
 143
 (2) (W)e note the particularly egregious abuses of the electoral process in this case. Sadlowski was not merely opposed by a member of the USWA "official family," Union officers and agents actively campaigned against him.(3) Union leadership having exerted such effort to oppose the candidacy of a single insurgent, it would be naive to assume that similar election "irregularities" have not or would not spread to other districts and locals where a member of the "official family" ran opposed. Had such tactics been successful in District 31, there appears to be little doubt that they would have been employed again, and again. The determination and vigor of this union member served to insure to all union members the rights which Congress intended to be theirs, and in this instance union democracy would have been a hollow promise without Sadlowski's involvement.
 
 
 144
 Majority Opinion at 605.
 
 
 145
 Although such rhetoric is usually associated with partisan politics, these are not excerpts from political campaign literature. These are statements from an opinion of this court. But they do not derive from the findings of any trial court. They are conclusions drawn by the majority on the basis of certain averments set forth in an application for attorneys' fees. The defendants were not required to challenge or contest the factual averments, because they were successful in a legal defense that, even if the alleged facts were true, no attorneys' fees were awardable as a matter of law. The federal practice that permits a challenge to the legal sufficiency of a claim tracks the common law demurrer, and admits, for the purpose of argument only, properly averred historical or narrative facts. That such facts are assumed for the purpose of testing a legal issue does not permit a court to draw from them, as did the majority, additional non-factual conclusions, e. g., "vindication of democratic process in USWA elections", "the particularly egregious abuses of the electoral process in this case", and "union democracy would have been a hollow promise without Sadlowski's involvement". As a member of this court, I am constrained to specifically disassociate myself from this extravagant language and from any resulting inferences which tend to impugn the integrity of the International President and members of the Executive Board of the Steelworkers' Union.
 
 
 146
 The particulars from which the majority's universals are drawn seem centered around two factual complexes: (1) tellers of Local 1066 had been guilty of vote fraud, see Majority Opinion at 601-603; and (2) Sadlowski's opponent, Samuel Evett, was supported by the international union's "official family", see Majority Opinion at 590. I find the sweeping conclusions drawn from these instances to be striking examples of the fallacy of composition and the fallacy of post hoc ergo propter hoc. To conclude that, because local tellers ran a fraudulent election the international union was responsible, is the fallacious error of reasoning that what is true of a part is necessarily true of the whole. To conclude that because international officers supported Sadlowski's opponent in a fraudulent election, the international was therefore responsible for the fraud, is the classic post hoc fallacy. The mere chronological sequence of events does not establish a causal connection.
 
 
 147
 Nevertheless, from this fragile foundation the majority hops to another facet of the same argument, contending that benefits accruing from a consensual agreement to conduct a second election could be traced with accuracy to a class of beneficiaries constituting the entire membership of the international union. Apparently referencing the prescriptions of Alyeska, the majority states that "(t)he overriding considerations in evaluation of 'common benefit' claims are: whether the benefits may be traced with some accuracy; whether the class of beneficiaries is readily identifiable; and whether there is a reasonable basis for confidence that the costs may be shifted with some precision to those benefiting." Majority Opinion at 604. I prefer the Alyeska Court's exact formulation: "In this Court's common-fund and common-benefit decisions, the classes of beneficiaries were small in number and easily identifiable. The benefits could be traced with some accuracy, and there was reason for confidence that the costs could indeed be shifted with some exactitude to those benefiting." 421 U.S. at 265 n. 39, 95 S.Ct. at 1625. Guided by this precise language, rather than the majority's paraphrase, I conclude:
 
 
 148
 (1) The 1,300,000 members of the United Steelworkers are not "small in number and easily identifiable."
 
 
 149
 (2) The benefits "can(not) be traced with some accuracy," other than to Sadlowski, who attained the position of District Director as a result of his efforts, and to the 300,000 members of District 31, the only USWA members directly involved in the election.
 
 
 150
 (3) Detailed studies invoking political science, labor relations, and economics would be necessary to detect the benefit to the average USWA member as a result of the rerun election in the Illinois-Indiana District. And, in any event, to shift the costs "with some exactitude" would require that Sadlowski and the members of his district pay a significantly greater portion of the fee than the average union member who, if he benefits at all, benefits less than the members of the specific district involved.
 
 
 151
 In reviewing the accomplishments of appellant's able counsel, I have nothing but the highest praise for the excellence of their services. I quarrel only as to who should pay for those services. I believe that Title IV precludes an award of attorney's fees in this case, and even if it does not, I believe that this is not an appropriate case for an equitable award under the common benefit theory. I would affirm the judgment of the district court.
 
 
 
 *
 Honorable Stanley S. Brotman, United States District Judge for the District of New Jersey, sitting by designation
 
 
 **
 See Appendix for the most pertinent provisions of Title IV (29 U.S.C. § 481 et seq.)
 
 
 [1]
 The district court concluded:
 ". . . I find no support in fact or in law for the grant of counsel fees in a suit brought under the general provisions of Title IV of the L.M.R.D.A., 29 U.S.C. §§ 481-483.
 ". . . The exception . . . recognized by the Third Circuit . . . (is) . . . (2) the conferring of a common benefit for the recovery of a fund or property;
 "Counsel for the intervenor has failed to demonstrate the existence of . . . a basis in law or a recognized exception to the general American rule which recognizes an award of attorneys' fees."
 Brennan v. United Steelworkers of America, Civil Action No. 73-957 (W.D.Pa. December 11, 1975), reproduced in appendix at 201a-206a.
 We disagree with the above-quoted conclusion of the district court as applied to this record.
 
 
 [2]
 Deposition of I. W. Abel at 5-7, Document No. 62B in Brennan v. United Steelworkers of America, Civil Action No. 73-0957B (W.D.Pa., Filed August 22, 1974)
 
 
 [3]
 Id. at 6-16
 
 
 [4]
 Article V of the Constitution of the International Union of the United Steelworkers of America (AFL-CIO, CLC, adopted at Las Vegas, Nevada, September 21, 1972) provides in relevant part:
 "Sec. 18. All contests in connection with the votes of any Local Union must be filed with the International tellers not later than ten (10) days after the date of election, by a member of the Local Union whose vote is contested.
 "Sec. 21. All contests growing out of the report of the International Tellers shall be filed with the International Executive Board, not later than ten (10) days following the mailing of the report to the Local Unions and candidates. The International Executive Board shall decide all such contests prior to June 1, of the election year."
 
 
 [5]
 This issue has apparently been considered only once before on the appellate level, by the District of Columbia Circuit in Usery v. Local Union 639 International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Ind., 543 F.2d 369 (D.C.Cir.1976) (hereinafter Local 639 ), cert. denied sub nom. Local Union No. 639 v. Marshall, 429 U.S. 1123, 97 S.Ct. 1159, 51 L.Ed.2d 573 (1977). We are greatly aided by the analysis of Judge Leventhal, and reach similar conclusions on very similar reasoning
 Local 639 differs from the instant case in that there the court granted summary judgment for the Secretary and intervenors, holding certain conduct to have been violative of Title IV; here a settlement agreement was reached whereby the USWA agreed to conduct a new election. As the Local 639 opinion noted, and as we find, the difference is not significant. Ultimate success in the form of a judgment has not been required in other contexts, Mills v. Electric Auto-Lite Co., 396 U.S. 375, 396, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970); Yablonski v. United Mine Workers, 151 U.S.App.D.C. 253, 466 F.2d 424, 431 (1972), cert. denied, 412 U.S. 918, 93 S.Ct. 272, 37 L.Ed.2d 144 (1973); cf. Kaham v. Rosenstiel, 424 F.2d 161 (3d Cir.), cert. denied sub nom. Glen Alden Corp. v. Kaham, 398 U.S. 950, 90 S.Ct. 1870, 26 L.Ed.2d 290 (1970), and Sadlowski's efforts and success are undiminished by the method used to achieve them.
 
 
 [6]
 Title I, the bill of rights of union members, relies upon private enforcement and provides for "such relief . . . as may be appropriate," 29 U.S.C. § 412. Title II, reporting provisions, also relies upon private enforcement, but expressly provides for the discretionary award of attorney's fees, 29 U.S.C. § 431(c). Title III, union trusteeships, provides for private enforcement, and, like Title I, approves relief as may be appropriate, 29 U.S.C. § 464(a). Title V, fiduciary responsibility of union officers, gives union members the right to sue, and specifically indicates that attorney's fees are part of the "appropriate relief" recoverable, 29 U.S.C. § 501(b)
 
 
 [7]
 See Comment, The Allocation of Attorney's Fees After Mills v. Electric Auto-Lite Co., 38 U.Chi.L.Rev. 316, 321-25 (1971)
 
 
 [8]
 Shapiro, Some Thoughts on Intervention Before Courts, Agencies, and Arbitrators, 81 Harv.L.Rev. 721, 746 (1968)
 
 
 [9]
 The proposal to change Sadlowski's elective base seems clearly prejudicial, as might be any additional nominations which would divert some of Sadlowski's support
 9a The transcript of the Deposition of I. W. Abel, President of the USWA, Document No. 62B in Civil No. 73-0957B (W.D.Pa.), contains the following at 4, 5-7, 9-10, 31-33, 36-37:
 "Q. (Mr. Rauh) So that the post of district director of District 31 as the largest is a very important post in your union?
 A. (Mr. Abel) Yes, under our constitution, the officers have an equal vote with the board member of the largest district. (Emphasis supplied.)
 Q. Well, there did come a time prior to the February, '73 election when you did decide to support Mr. Evett, did you not?
 A. Oh, yes. Yes. Maybe, to make it clear, maybe make it so that you won't have to ask a lot of questions, we have, well, since I was going to say since '65, and that would be a good figure, but pretty much from the beginning of the election of officers of this union, the official family pretty much supports each other, you know, and I think this has been the case up until well, as an example, when Phil died and I became secretary-treasurer, the Board designated me as the McDonald successor, and then almost without any indications, everybody went out and supported my candidacy and supported Dave for president.
 Q. Mr. Abel, would you sort of elaborate on official family? Did you mean the three international officers plus the district directors?
 A. District directors.
 Q. That would be what you would consider?
 A. Right.
 A. Starting, again, in our campaign in '65, we set up our own little political organization, so to speak. We designated Joe Germano as our chairman, Alex Fuller as our secretary and Tom Murray, who was then with us as assistant to the secretary-treasurer, as the treasurer of our group, and this organization was designed to raise funds and direct the campaign.
 Q. This would be the campaign of the official family, would that be fair?
 A. In '65, yes, . . .
 A. Yes. Well, then, when we came up this last time, Murray had retired and Germano was retiring and so was Joe Molony, so we made Germano and Molony as co-chairmen. We made Harry Guenther, who succeeded Tom Murray, as the treasurer and Alex Fuller continues to be the secretary of the group.
 Now, here again, they engaged the assistance and services of people to run a campaign, and I assume that letter was put together by them, and in this instance sent to the membership in District 31.
 When there was a contest in other areas, I suppose a similar letter was sent out. I don't know, but I assume that.
 A. Well, all that I have had anything to do with is in the way of financial assistance, in line with what we have always done.
 A. Well, I made a contribution, as an example.
 Q. You have made a contribution to Steelworkers for Continued Leadership this year?.
 A. Right. Right. Yes.
 Q. That is since the new election
 A. Oh, yes.
 Q. was agreed to?
 A. Yes.
 Q. And how much was that?
 A. Five hundred dollars by personal check.
 Q. I think in addition to that you said you had talked about financial assistance for Mr. Evett. How was that to be obtained, other than your check, sir?
 A. Well, the normal procedure, and I assume that's the procedure being followed at the present time, while I am not clear that it is, that each director will make a contribution, perhaps some won't, I don't know, but assume they will, and assume that in most cases the directors will talk to their staff people and others about making a contribution, too.
 Q. Now, do you know of any place where that has already occurred?
 A. Well, I talked to Lynn Williams, our director from District 6 in Canada, who was in the other day, and he told me he was raising some money.
 Now, he didn't go into the amount or how. I'm told that various of our directors have talked to their staff. In one case, over in Youngstown, I believe it is, that the director has given out a copy of a letter that Harry Guenther sent out to the directors, recommending that contributions be made and recommending, I think, in cases of directors a $500 contribution, and in case of staff people, a solicitation of $50, something like that.
 Q. . . . Would you just tell me if you said the following: Did you say you were supporting Evett?
 A. I don't think so, and I wouldn't know that there would be any need for it. They have known that from the last election.
 Q. Did you say that Mr. Sadlowski could win and the staff should get out and hustle for Evett?
 A. As I say, I don't recall, but I don't listen to myself, as I told you.
 I would assume that anybody would say that Sadlowski can win. Any candidate can win, as you and I know from our political experiences.
 Q. Well, I'm asking another question. Did you say that, quote, the staff should get out and hustle for Evett?
 A. No. I think I said that the staff should assume their responsibility of leadership. I stressed leadership in that meeting that I am aware of, both at the convention as well as the district level, and the importance of seeing to it that their local unions not only participated in the election but did it properly."
 9b The Verified Application contains this language at 112a:
 "Harry Guenther, Assistant to the International Secretary-Treasurer, testifying that the official fund-raising arm of the International Union was seeking money for Evett the 'suggested' amount was $500 per Executive Board member and $50 from each staff representative and 'a further request might be necessary.' The nature of this appeal, communicated to all District Directors is such that at least one Director called a special meeting to distribute copies of the 'suggestion' in envelopes marked 'confidential.' "
 
 
 [10]
 See pages 17-19 (105a-107a) of the Verified Application for Attorneys' Fees, where this language appears:
 "In June, 1974 Intervenor decided to take the depositions of Stanley A. Lichon and Danny Cifalia. At the time of the February 13, 1973 election they were presidents of locals in which the Department of Labor had found considerable evidence of ballot fraud.34 There were allegations of Evett's staff involvement in both cases. In addition, in the case of Cifalia's local 1066, actions taken by the USWA had created the inference that a cover-up of the involvement of employees of the International Union in massive ballot fraud was in progress. The USWA made strenuous efforts to prevent the questioning of Lichon and Cifalia. The official announcement of the Union's capitulation came during the delayed taking of Lichon's deposition on July 12, 1974 and while Cifalia was still being kept from questioning.
 
 
 [34]
 Lichon is the president of local 7610 and was the chief teller in the contested election. In his complaint to the International Tellers Sadlowski had charged fraud in 7610. He had supplied the Tellers with the signed statements of 44 members of that local who said they voted for Sadlowski. In the official tally Sadlowski received 22, Evett was credited with 215
 Cifalia was the president and chief teller of local 1066. Shortly after the contested election he was appointed a staff representative. (He resigned after the local membership found him guilty of vote fraud in the contested election). In that election the official tally was Evett 935, Sadlowski 239. Admissions from the perpetrators of the fraud demonstrated that the names of 600-700 members had been forged and the ballot box stuffed with Evett votes. Lehman Deposition pp. 79-93.
 "The membership of local 1066 had imposed fines, including restitution of $3,996.38 for election expense, and suspensions, upon Cifalia and four other tellers found guilty of vote fraud.
 "Thus, by virtue of actions taken by Intervenor's counsel, the USWA Board meeting on July 9, 1974 was faced with a substantiated charge of attempted cover-up of illegal activities and a demand for depositions of two local union presidents who, according to Intervenor's evidence, engaged in unlawful conduct under the prodding of USWA staff representatives, as well as substantiated charges of illegal use of union funds. At that meeting, the board decided to capitulate."
 10a See also, for example, F.R.Civ.P. 56(e), contemplating that a party must respond to affidavits of his adversary setting forth by affidavits, depositions, etc., "specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him."
 
 
 [11]
 But see pages 606-607 and note 13 infra
 
 
 [12]
 The fact that the Secretary of Labor brought suit against the local in Local 639, rather than the international, as here, does not suggest that the District of Columbia Circuit would have found differently had suit been brought against the entire union, particularly in view of the union structure in this case, discussed below
 
 
 [13]
 For example, where the magistrate recognized the concept enunciated in Mills and Hall, that attorneys' fees may be recoverable when a common benefit has been conferred, even though no fund or property is recovered (176a), the district court did not (206a and note 1 above); where the magistrate felt that an award based upon the common benefit theory was inappropriate on the facts of this case because of the greater benefit conferred upon District 31 and the burden such fees would place on the union as a whole, the district court found "no support in fact or in law for the grant of counsel fees in a suit brought under the general provisions of Title IV" (203a); and where the magistrate stated that "(t)he acts of counsel for the intervenor in many respects duplicated the efforts of the Secretary" (184a), the district court held that "any independent investigation which the intervenor might have undertaken was voluntary and self-serving and at the most a mere fraction of and duplicitous of the work entrusted to the Secretary by Congress" (204a) a statement contrary even to the position taken by the Secretary in his Response . . . to Application for Attorneys' Fees, filed March 7, 1975. See Doc.No. 78B in Civil Action No. 73-0957B (W.D.Pa.) where the Secretary conceded, at pages 2-3, that:
 "Without attempting to detract from the efforts of counsel for intervenor, it must be pointed out that it is quite customary for the Department's investigators to receive assistance from the complainant in the conduct of their investigation of an election. . . . Indeed it is self-evident that the major part of the leads pursued by the investigators in such an investigation derive from the complainant's allegations."
 
 
 [14]
 While we do not believe that conferral of a greater benefit upon one particular group prejudices or prohibits an award against a larger benefitted group, the degree of benefit may be relevant to the amount of any award against either. It is conceivable that the benefit to the smaller group would be so greatly disproportionate to the benefit to the larger group that the application of equitable principles would require the assessment of all or the greatest part of the attorneys' fees against the smaller group. However, this record does not seem to present such a situation
 
 
 [15]
 Also we point out that this was not a case involving over a thousand pages of testimony, which could be beneficially summarized in a magistrate's report making reference to the pertinent pages, but one where the record consisted of a single 58-page verified affidavit containing legal argument on many of those 58 pages
 
 
 [16]
 The district court is, of course, free to take further evidence on common benefit and any surrounding circumstances if it concludes that the record is not adequate
 
 
 [17]
 Those decisions include: Lindy Bros. Builders, Inc. v. American Radiator and Standard Sanitary Corp., et al., (Lindy II), 540 F.2d 102 (3d Cir. 1976); Marola v. Atlantic Richfield Co., (Merola II), 515 F.2d 165 (3d Cir. 1975); and Lindy Bros. Builders, Inc. v. American Radiator and Standard Sanitary Corp., et al., (Lindy I), 487 F.2d 161 (3d Cir. 1973)
 
 
 [18]
 See page 598 above. It is clear that some duplication of effort will always occur, since the Secretary must verify information relating to improper union conduct secured and supplied by an intervenor's counsel. Also, time limitations and exhaustion requirements of 29 U.S.C. § 482 and other provisions, may necessitate legal services on behalf of the Secretary as well as such services on behalf of the intervenor. In this case, the decision of the Secretary to terminate the investigation may have justified the continued efforts of counsel for the intervenor to document and preserve evidence of union misconduct. See Verified Application for Attorneys' Fees at 103a-104a
 
 
 [1]
 Based on a lodestar of 1,279 hours at the rate of $100 per hour for senior counsel and $50 per hour for associates, appendix 139-40, see Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp., 540 F.2d 102 (3d Cir. 1976), appellee suggests that appellants may be asking for as much as $500,000. Appellee's Brief at 5
 
 
 [2]
 See R. Aldisert, The Judicial Process 1-3 (1976); Aldisert, An American View of the Judicial Function, in Legal Institutions Today: English and American Approaches Compared 43 (Harry W. Jones, ed., 1977)
 
 
 [3]
 In Usery v. Local Union No. 639, 543 F.2d 369 (D.C.Cir.1976), cert. denied, 429 U.S. 1123, 97 S.Ct. 1159, 51 L.Ed.2d 573 (1977), there was an adjudicated violation upon which the rerun election was predicated. See 543 F.2d at 384 n. 39. That, in tandem with the fact that the Usery action was brought against a local rather than the international union, distinguishes that case from this one. It does not, however, necessarily bring my view into line with the District of Columbia Circuit's. While there might arguably be a sounder basis for equitable relief in the case of an adjudicated violation, Title IV, in my view, still would preclude a fee award